**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Djime Kebe,<br>Petitioner<br>-vs-<br>Jon Gurule,<br>Respondent. | CV-16-1116-PHX-JAT (JFM)<br><br>**Report & Recommendation**<br>**on Petition for Writ of Habeas Corpus** |

## I. MATTER UNDER CONSIDERATION

Petitioner, presently incarcerated in the Eloy Detention Center, in Eloy, Arizona filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 on April 18, 2016 (Doc. 1). On June 21, 2016 Respondent filed his Response (Doc. 9). Petitioner filed a Reply on July 13, 2016 (Doc. 11).

The Petitioner's Petition is now ripe for consideration. Accordingly, the undersigned makes the following proposed findings of fact, report, and recommendation pursuant to Rule 8(b), Rules Governing Section 2254 Cases,[1] Rule 72(b), Federal Rules of Civil Procedure, 28 U.S.C. § 636(b) and Rule 72.2(a)(2), Local Rules of Civil Procedure.

## II. RELEVANT FACTUAL & PROCEDURAL BACKGROUND
### A. FACTUAL BACKGROUND

Petitioner is not a citizen or national of the United States, but is a citizen and national of Senegal. On or about March 1, 2015 he applied for admission to the United States at the Otay Mesa Port of Entry from Mexico, under the name of Djime Kebe,

---

[1] The Rules Governing Section 2254 Proceedings are applicable to petitions for writs of habeas corpus under 28 U.S.C. § 2241. *See* Rules Governing Section 2254 Cases, Rule 1(b).

1

reporting a birth date making him 25 years of age. (Attachment C, Determ. Inadmissability; Att. A, Rec. Deportable/Inadmissible Alien at 2.) (Attachments to the Answer, Doc. 9, are referenced herein as "Att. ___.")

B.   **REMOVAL PROCEEDINGS**

Because Petitioner had no valid unexpired passport, visa or other authorization, he was charged with being removable. On March 3, 2015, Petitioner was determined inadmissible. (*Id.*) Petitioner requested asylum on the basis of a credible fear of persecution or torture pursuant to 8 C.F.R. § 208.30. A hearing was conducted on March 26, 2015, and the Hearing Officer found no such credible fear. (Att. E, Rec. Credible Fear.) Petitioner requested review, and the matter was referred to an immigration judge for review. (Exhibit F, Notice of Referral.)

Meanwhile, on April 30, 2015, Petitioner advised immigration officials that he was not the person who he previously claimed to be, and was under 18 years of age. He asserted the name he provided was that of his brother, who was in Senegal. A dental forensic exam was scheduled. (Exhibit G, Emails 4/30/15 and 7/30/15.) The result of the dental exam was a determination that Petitioner was "age 18 years or older." (Exhibit H, Dental Report.)

On July 19, 2015, the immigration judge found, without an evidentiary hearing, that Petitioner had not established a significant possibility of persecution, and affirmed the decision of the immigration officer and returned the case to DHS for removal. (Exhibit I.) However, Petitioner filed a request for reconsideration, which was granted on August 12, 2015. (Exhibit J.)

A "credible fear" interview of Petitioner was conducted on September 2, 2015, with the interviewer finding Petitioner credible, but concluding that a credible fear of persecution was not shown. (Exhibit K, Record of Determination at ¶¶ 4.1 and 4.15.) Petitioner reported his date of birth as 1999, albeit misspeaking at first saying 1998. (*Id.* at Interview p. 2, 8.) Petitioner reported fear of harm from his uncle because of business

losses and from his father for dropping out of school.  (*Id.* at 13.)

Subsequently, on September 23, 2015, the asylum officer concluded that Petitioner had not established a credible fear of harm on the basis of race, religion, nationality, political opinion, or social group, or that harm would be inflicted by a government official.  (Exhibit K at Record of Negative Credible Fear Finding.) Petitioner again requested review by an immigration judge, but refused to sign the form. (*Id.*)

On October 8, 2015, Petitioner was given a Warning for Failure to Depart (Exhibit L), and Instruction Sheet (Exhibit M) regarding assisting in removal.  A second set were give on January 20, 2015 (Exhibits N, O).

### C.     DETENTION PROCEEDINGS

Petitioner was detained at least as of March 5, 2015.  (Exhibit E, Rec. Cred. Fear.)

On March 30, 2016, upon conclusion of the removal period, a Decision of Post-Order Custody Review was issued, finding that Petitioner would be a flight risk and would be unable to comply with conditions of release, and directing that Petitioner remain in custody until removed.  (Exhibit P.)

On April 6, 2016, Petitioner sough a custody redetermination, seeking release on "a relatively low bond," citing the absence of criminal history, non-dangerousness, no prior immigration history, and presentation at a port of entry.  He argued he did not present a risk of flight.  (Exhibit Q.)

In the meantime, the Government had contacted the Embassy of Senegal and Consulate of Senegal to arrange for travel documents.  Travel arrangements remained pending as of April 7, 2016.  (Exhibit R, Transfer Checklist.)

On May 2, 2016, the immigration judge declined reconsideration of the custody determination (Exhibit S) based on a lack of jurisdiction.

On May 3, 2016, the Office of Enforcement and Removal Operations issued a Decision to Continue Detention (Exhibit T), determining that Petitioner would continue

to be detained.  The decision opined:

> ICE is currently working with the Government of Senegal to secure a travel document for your removal from the United States.  A travel document from the Document of Senegal is expected, therefore you are to remain in ICE custody at this time.

(*Id.*) The decision went on to indicate Petitioner's ability to seek reconsideration on the basis that his removal was unlikely.  And it advised Petitioner of his obligation to assist in his removal, citing INA 241(a)(1)(C) (8 U.S.C. § 1231(a)(1)(C)), and warned that criminal prosecution could result from failure to do so.  (*Id.*)  However, that custody determination was not based on Petitioner's failure to cooperate in his removal.

As of June 9, 2016, the Government continued to await travel documents from Senegal, and identity documents from Petitioner.  (Exhibit U, Declaration at 3.)

## D.   PRESENT FEDERAL HABEAS PROCEEDINGS

**Petition** - Petitioner commenced the current case by filing his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 on April 18, 2016 (Doc. 1).  Petitioner's Petition asserts a single ground for relief, arguing that he is being held in detention in violation of *Zadvydas v. Davis*, 533 U.S. 678 (2001), and seeking release on supervision.

**Response** - On June 21, 2016 Respondent filed his Response ("Answer") (Doc. 9).  Respondent argues that *Zadvydas* does not apply because Petitioner has provided various names and dates of birth, and no proof his true identity, and thus his continuing detention is the result of his own failure to cooperate, citing *Pelich v. I.N.S.*, 329 F.3d 1057, 1061 (9th Cir. 2003).  Respondent further argues that Petitioner has failed to show that his removal in the reasonably foreseeable future is not substantially likely, because removal to Senegal is routinely completed, and efforts to identify Petitioner and obtain travel documents are ongoing.

**Reply** - On July 13, 2016, Petitioner filed a Reply (Doc. 11).  Petitioner argues that the forensic dental determination of his age is unreliable, that his true name is Mouhamed Kebe, he was under 18 when placed in custody, and that he has cooperated

4

with removal by providing phone numbers of relatives in Senegal, and a family friend in the United States.

To the extent that Petitioner might intend his Reply to assert a claim that he continues to be under the age of 18, and thus not subject to detention, the undersigned does not consider that claim. "The district court need not consider arguments raised for the first time in a reply brief." *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

### III.   APPLICATION OF LAW TO FACTS
**A.   <u>DUE PROCESS LIMITS ON DETENTION PENDING REMOVAL</u>**

**1.  <u>Post Removal Order Detention</u>**

"Ordinarily, the INS is expected to remove an alien in its custody within ninety days from the issuance of a final removal order." *Pelich v. I.N.S.*, 329 F.3d 1057, 1058–59 (9th Cir. 2003). *See* 8 U.S.C. § 1231(a)(1)(A)-(B). However, when removal is not completed within that time, various provisions permit continued detention of the alien, including 8 U.S.C. § 1231(a)(1)(C) and (a)(6).

**2.  <u>Six Month Rule</u>**

The most common such provision is 8 U.S.C. § 1231(a)(6), under which inadmissible aliens, certain classes of removable aliens (generally those with certain criminal records), and those determined to be a flight risk or unlikely to comply with the order of removal, can have their detention continued indefinitely. In *Zadvydas,* however, the Supreme Court concluded that constitutional concerns would limit such indefinite detention, and construed § 1231(a)(6) to limit such an alien's post-removal detention to "a period reasonably necessary to bring about that alien's removal." 533 U.S. at 689. The court established a six month limitation, after which the alien may be entitled to release from detention.

"Though *Zadvydas* dealt only with aliens detained pursuant to Section 1231(a)(6) who were removable under Section 1227(a)(1)(C), 1227(a)(2) or 1227(a)(4), the Supreme Court subsequently extended its holding to the other two categories of aliens

governed by the statute: aliens inadmissible under Section 1182 and aliens determined by the Secretary of Homeland Security to be a risk to the community or a flight risk. We have further extended the *Zadvydas* framework to discretionary detention pursuant to Section 1225(b) and 1226(a), finding that indefinite detention under these statutes poses the same constitutional concerns present in *Zadvydas*." *Rodriguez v. Hayes*, 591 F.3d 1105, 1115 (9th Cir. 2010).

"*Zadvydas* places the burden on the alien to show, after a detention period of six months, that there is 'good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future.' " *Pelich*, 329 F.3d at 1059 (quoting *Zadvydas*, 433 U.S. at 701). "The INS must then introduce evidence to refute that assertion. *Id.* at 1059.

### 3. Requirement for Cooperation

**Provision for Detention** - A separate provision, 8 U.S.C. § 1231(a)(1)(C), governs the detention of aliens who fail or refuse to cooperate in their removal.

> The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal.

8 U.S.C. § 1231(a)(1)(C). Under this provision, an alien's post-removal order detention can also become protracted.

***Zadvydas* Doesn't Apply** - In *Pelich*, the Ninth Circuit declined to decide whether a *Zadvydas* type of analysis could apply to detention under § 1231(a)(1)(C) (as opposed to the detention under § 1231(a)(6) addressed in *Zadvydas*). Nonetheless, the court concluded that the constitutional concerns addressed in *Zadvydas* would not in any event apply under § 1231(a)(1)(C) because "[t]he risk of indefinite detention that motivated the Supreme Court's statutory interpretation in *Zadvydas* does not exist when an alien is the cause of his own detention." *Pelich*, 329 F.3d at 1060. *See Rodriguez v.*

*Hayes*, 591 F.3d 1105, 1116 (9th Cir. 2010). "The reason is self-evident: the detainee cannot convincingly argue that there is no significant likelihood of removal in the reasonably foreseeable future if the detainee controls the clock." *Pelich*, 329 F.3d at 1060.

Another panel of the Ninth Circuit summarized as follows:

> We hold today, consistent with *Zadvydas* and *Pelich*, that when an alien refuses to cooperate fully and honestly with officials to secure travel documents from a foreign government, the alien cannot meet his or her burden to show there is no significant likelihood of removal in the reasonably foreseeable future. We cannot know whether an alien's removal is a "remote possibility," until the alien makes a full and honest effort to secure travel documents. A particular alien may have a very good chance of being removed, but if that alien is refusing to cooperate fully with officials to secure travel documents, neither the INS nor a court can sensibly ascertain the alien's chance of removal. Moreover, the due process concerns that motivated the Supreme Court in *Zadvydas* do not apply when an alien may have "the keys [to freedom] in his pocket." We conclude that 8 U.S.C. § 1231(a)(1)(C), interpreted mindful of the concerns underlying *Zadvydas* and *Pelich*, authorizes the INS's continued detention of a removable alien so long as the alien fails to cooperate fully and honestly with officials to obtain travel documents.

*Lema v. I.N.S.*, 341 F.3d 853, 856–57 (9th Cir. 2003) (citations omitted).

**Establishing Non-Cooperation** – Section 1231(a)(1)(C) applies where the alien has failed or refused or conspired or acted in ways that prevent his removal. The section "pertains only to intentionally obstructionist, bad faith tactics that are designed to frustrate the government's attempts to effectuate a removal order, not to an alien's good faith attempt to make use of legally available judicial review and remedies." *Diouf v. Mukasey*, 542 F.3d 1222, 1232 (9th Cir. 2008).

In *Pelich*, the court looked to several factors to find a failure to cooperate to show that the alien qualified for extended detention under 8 U.S.C. § 1231(a)(1)(C). These included: (1) failure to fill out a passport application, which was a prerequisite to obtaining travel documents; and (2) providing the INS with "conflicting information regarding his name, his parents' names, his parents' birthplaces and residences, his birthplace and his nationality." 329 F.3d at 1059.

In *Lema*, the alien had been found removable to Ethiopia, but Ethiopia refused to issue travel documents because the alien told the consular official that he was Eritrean, not Ethiopian. To find a failure to cooperate, the court looked to the alien's failure to: (1) furnish the foreign government or the INS with any new evidence (such as affidavits from family members) to support his claim of Ethiopian nationality; (2) file a new request for travel documents; (3) attempt to contact the Ethiopian consulate; and (4) . comply with an INS request that he provide the INS with certain documents. *Lema*, 341 F.3d at 857.

**Effect of Non-Cooperation** – Past obstruction does not justify continuing detention under 1231(a)(1)(C). *See Singh v. Gonzales*, 448 F. Supp. 2d 1214, 1219 (W.D. Wash. 2006) ("although petitioner initially refused to cooperate…petitioner began cooperating…[a]ccordingly, ICE's claim that petitioner has failed to cooperate is now moot").

However, where an alien has failed to cooperate with his removal, triggering detention under § 1231(a)(1)(C), the removal period is extended until the non-cooperation terminates. Thereafter, the Government has 90 days to complete removal, allowing the alien's detention during that time under § 1231(a)(2), and thereafter it would shift to § 1231(a)(6), which is subject to the *Zadvydas* limitations. *Diouf v. Mukasey*, 542 F.3d 1222, 1231-1232 (9th Cir. 2008).

**4. Standard of Review**

Where the administrative agency has made a ruling on an issue within its purview, this court's review is limited to determining whether the "findings of fact were supported by substantial evidence and whether the [agency's] decision was arbitrary, capricious, an abuse of discretion, or contrary to law." *DeBrown v. Department of Justice*, 18 F.3d 774, 777 (9th Cir.1994). *See Singh v. Reno*, 113 F.3d 1512, 1514 (9th Cir. 1997) (applying *DeBrown* to immigration habeas). "To reverse under the substantial evidence standard, the evidence must be so compelling that no reasonable factfinder could fail to find the

8

facts were as the alien alleged." *Singh*, 113 F.3d at 1514.

**B.     APPLICATION TO PETITIONER**
**1.  Basis for Detention**

Petitioner's Petition asserts rights to release under *Zadvydas*. *Zadvydas* generally applies to post-removal period detention under 8 U.S.C. § 1231(a)(6). Detention under that provision occurs upon expiration of the 90 day removal period, which commences with the entry of a final order of removal.[2] Here, Petitioner's final order of removal was issued on September 23, 2015. That was the date his removal order "[became] administratively final." 8 U.S.C. § 1231(a)(1)(B)(i).[3] The removal period expired 90 days later, on December 22, 2015.

The Government thereafter had "a presumptively reasonable six-month period of post-removal period detention," *Prieto-Romero v. Clark*, 534 F.3d 1053, 1062 (9th Cir. 2008), or until June 21, 2016, to complete Petitioner's removal. However, if Petitioner's continued detention is authorized under 8 U.S.C. § 1231(a)(1)(C), Petitioner cannot directly rely upon *Zadvydas*. *Pelich*, 329 F.3d at 1060.

Respondent argues that is the case, and that Petitioner's provision of a variety of names and dates of birth and failure to cooperate in substantiating his identity, amount to actions "prevent[ing] the alien's removal subject to an order of removal." 8 U.S.C. § 1231(a)(1)(C).

Petitioner does not deny having provided such confusing information. Rather, he seeks to refute assertions that he is over 18 years of age (to support the contention that he is now being truthful), argues his provision of phone numbers of family and friends, and

---

[2] Under *Diouf*, the commencement of the removal period would be delayed until any non-cooperation ceased. 542 F.3d at 1231-1232. However, as discussed hereinafter, any non-cooperation (*e.g.* obfuscation of Petitioner's identity) ceased as of April 30, 2015, before entry of the final order of removal.

[3] The other triggers for the removal period are the conclusion of judicial review of removal or release from non-immigration detention. 8 U.S.C. § 1231(a)(1)(B)(ii) and (iii). Neither of those apply here.

asserts he has not refused to execute any travel documents.

Here, however, Petitioner's detention is, under the Decision issued by the ERO Office on May 3, 2016 (Exhibit T), is plainly not on the basis of § 1231(a)(1)(C). The decision does not rely on that section and only cites it as a warning to Petitioner. Rather, it appears that the decision was simply a continuation of the determination in the ERO decision issued on March 30, 2016, which was based solely on Petitioner's flight risk and ability to comply with supervision. (Exhibit P at 2.)

Thus, while Respondent may be arguing the applicability of § 1231(a)(1)(C), that does not appear to be the basis on which ICE has concluded to detain Petitioner. Respondent proffers no authority which would permit Respondent to substitute a different rationale for detention.

Nonetheless, because it does not affect the outcome, the undersigned presumes for purposes of this R&R that Respondent may now rely on § 1231(a)(1)(C).

In so doing, however, the undersigned concludes that there is no agency determination applying § 1231(a)(1)(C) to Petitioner, and thus no deference to any factual findings or legal conclusions of the agency need be applied.

### 2. No Failure to Cooperate

Looking to the factors considered in *Pelich* and *Lema*, the undersigned does not find a failure to cooperate.

**Documents** - Here, Petitioner has not refused to execute any proffered documents. Indeed, short of producing a birth certificate or some other proof of his identity (with no explanation of how Petitioner could do so from his detention cell), Respondent offers no further action that Petitioner has refused to do to aid in his removal. Respondent argues that Petitioner is refusing to produce information, but fail to identify what information has not been provided.

**Obfuscation** – Respondent argues that Petitioner "is attempting to delay deportation by providing changing and inconsistent information." Clearly, Petitioner has

1  provided conflicting information about his identity.

2  Upon entry in March, 2015 he provided the name Djime Kebe, and a date of birth
3  in June, 1989. (Exhibit B, Record of Sworn Statement.) He repeated it during his first
4  asylum interview.[4] (Exhibit E at 2.)

5  Petitioner didn't assert the name Mouhamed until a month later, on April 30,
6  2015, claiming at that time a date of birth of October, 1999. (Exhibit G, Emails.) Again,
7  in an interview with removal officials on July 30, 2015, he reported his name as
8  Mouhamed Kebe, and his birth date as 1999. (Exhibit U, Declaration at ¶ 6.)

9  Petitioner still asserts his actual name is Mouhamed Kebe. (Reply, Doc. 11 at 3.)
10 He remains unclear about his date of birth, simply arguing that the dental evidence is
11 unreliable. (*Id*. at 1-2.) He argues that his name is Mouhamed and that Djime Kebe is
12 his older brother, and that he used Djime's identity because Petitioner was too young to
13 get an ID and thus he used his brother's passport. (Reply, Doc. 11 at 3.)

14 Indeed, since April, 2015 (long before completion of his removal proceedings),
15 Petitioner has consistently asserted the identity of Mouhamed Kebe, born October, 1999.
16 There have been only three arguable exceptions. First, Petitioner's various filings have
17 consistently been submitted under the name "Djime Kebe." However, that is not
18 surprising given the administrative record adopting Djime as Petitioner's true identity.

19 Second, in his request for custody redetermination, dated April 6, 2016, he
20 referenced his name as "Mr. Guira." (Exhibit Q.) But that appears to have been the
21 result of re-using a form motion. Petitioner has never, outside that document even
22 referenced the name "Guira," and otherwise plainly identified himself by the surname
23 Kebe.

24 Third, in his asylum hearing on September 2, 2015, he appears to have asserted a
25 date of birth date of June, 1989. But that came on the heels of the translated interview

---

[4] Respondents contend that Petitioner provided birth date in July, 1989 at the first asylum interview on March 20, 2015. (Answer, Doc. 9 at 3 (citing Exhibit E).) While there are two redacted dates in the cited exhibit, the visible record reflects just "1989." (Exhibit E at 2.)

11

regarding use of the passport of his brother "Djime."

> Q. What is your complete name?
> A. Mouhamed KEBE
>
> Q. Have you ever used or been known by any other names or aliases?
> A. My name is Mouhamed KEBE but when I was caught at the border they found my brother's passport in my pocket, but my name is Mouhamed Kebe.
>
> Q. Name on PP?
> A. Djime, KEBE, my brother's name.
>
> Q. Have you ever used the name Djime KEBE?
> A. No, I always use my name, Mouhamed Kebe.
>
> Q. What is your date of birth?
> A. June 21, 1989.

(Exhibit K, Transcript at 2.) The fact that Petitioner otherwise identified himself with the name "Mouhamed" and an October, 1999 birth date is reflected in the Biographic Information section of the Credible Fear Worksheet from the same proceeding. (Exhibit K, Worksheet at 2.) Indeed, the finding in that proceeding was that Petitioner's identity "was determined with a reasonable degree of certainty" based on Petitioner's "own credible statements." (*Id.* at 4.)

Thus, the only substantial evidence, apart from Petitioner's own repudiated assertions about his identity, suggesting that Petitioner has not provided his true identity is the dental dating.[5] The dentist opined that Petitioner was "18 years or older." (Exhibit H.) This would be inconsistent with Petitioner's assertion that he is just now 17, and was only 15 years and 6 months old when the study was done in April, 2015. Petitioner argues that the study is not reliable because it was based on the eruption of Petitioner's teeth, and the dates of eruption are not uniform. (Reply, Doc. 11 at 1-2.)

Indeed, the report is not overwhelmingly convincing, asserting only that the examination findings "indicate" Petitioner was 18 or older. No level of confidence or potential for error is provided, no discussion of the dentist's credentials to make the

---

[5] It is unclear to the undersigned whether the dental dating (Exhibit H) was ever relied upon in resolving Petitioner's removal and detention decisions.

12

determination (apart from being a dentist), and no information is given about the methodology or level of acceptance of the science relied upon. On the other hand, Petitioner presents at least some authority reporting that the factual finding made by the dentist (e.g. eruption of third molars), did not establish anything more than a probability that Petitioner is older than 17, and that Petitioner would arguably be in the recognized outliers.

**Active Cooperation** - On the other hand, Petitioner has provided affirmative assistance in obtaining records. With his assistance, the Government has made contact with an extended family member, Mr. Jobe, who purported to be cooperative, offering to forward any documents he obtained from the family. (Exhibit U, Declaration at ¶¶ 7, 8, 21.) Petitioner also provided contact information for a friend, Mr. Diop, but he did not respond to inquiries. (*Id.* at ¶ 21.)

Petitioner also provided contact information for his mother and brother in Senegal. An officer facilitated a phone conversation between Petitioner and his brother, and Petitioner reported that the brother was to forward a birth certificate to Mr. Jobe. (*Id.* at ¶ 7, 9.) Respondent proffers nothing to suggest that there is more Petitioner could do to facilitate obtaining a birth certificate through family members.

In addition, Petitioner has cooperated in an interview with the Embassy of Senegal on October 7, 2015. (*Id.* at ¶¶ 13, 14.) In May, 2016, the ICE Attaché in Senegal reported that he was working to obtain identity documents from Petitioner's family in Senegal. (*Id.* at ¶ 23.) Since then, there appears to have been no denial of travel documents by the Embassy of Senegal, simply in action. (*Id.* at ¶¶ 20, 22, 24.) Similarly there is indication that Senegal has requested additional documents, information, or assistance from Petitioner that he has failed to provide.

At the end of the day, Respondents point to no current inaction on the part of Petitioner other than his failure to produce a birth certificate or other document. Of course, that is unsurprising given Petitioner's detention.

At most, Respondent points to the confusion over Petitioner's identity. But

Petitioner has (ignoring what may well be translation or editing issues) consistently reported his identity as Mouhamed Kebe, born in 1999, since April 30, 2015, long before his removal order became final.

In sum, Respondent offers scant proof that Petitioner currently "fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal."  8 U.S.C. § 1231(a)(1)(C).

Therefore, because it does not affect the outcome, the undersigned presumes for purposes of this Report and Recommendation that Petitioner's detention cannot be maintained under 8 U.S.C. § 1231(a)(1)(C).  In such an instance, the only basis for continuing to detain Petitioner would be the rationale adopted in the custody determination of May 2, 2016, *i.e.* flight risk under § 1231(a)(6).

Of course, detention under that provision is subject to the limits in *Zadvydas*.

### 3.  Length of Detention

Here, Petitioner's post-removal period detention has continued since December 22, 2015.  Thus, the six month presumptively reasonable period under *Zadvydas* expired on June 21, 2016, and Petitioner's post-removal period detention has now extended to in excess of 9 months.[6]

### 4.  Likelihood of Removal in Reasonably Foreseeable Future

Petitioner argues in the Petition that there must be evidence to support detention beyond the six month period. (Petition, Doc. 1 at 4.)  However, "*Zadvydas* places the burden on the alien to show, after a detention period of six months, that there is 'good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future.' " *Pelich*, 329 F.3d at 1059 (quoting *Zadvydas*, 433 U.S. at 701).

---

[6] Petitioner's Petition was filed on April 18, 2016, before the six month period had expired.  Respondent's Answer, however, was filed on June 21, 2016, on the expiration.

14

1  Apart from the lack of success to date, Petitioner proffers nothing to show there is not a
2  likelihood of removal in the reasonably foreseeable future.
3         Petitioner (apparently counting from the date of the removal order, rather than the
4  end of the removal period) complains that his custody reviews are being proffered 90
5  days late. (Reply, Doc. 11 at 4.) But this does not establish that his removal is not
6  foreseeable.
7         Petitioner complains that there is no proof to support the claims that a travel
8  document was pending with the Senegal Embassy. (Reply, Doc. 11 at 4.) But the initial
9  burden of proof is not on Respondent to prove foreseeability, but upon Petitioner to
10 disprove it. Petitioner proffers nothing to show that the travel documents request is not
11 still pending with the Senegal Embassy.
12        Similarly, Petitioner's complaints about the lack of various details in
13 Respondent's assertion that removals to Senegal are regularly completed does not satisfy
14 his burden.
15        Petitioner suggests that his being a minor might keep him from being removed.
16 But he fails to explain why this would be the case.
17        In contrast, in *Zadvydas*, Mr. Zadvydas had been held in post-removal period
18 custody for some seven years after being originally ordered removed to Germany, with
19 little reason to hope for timely removal:

> In 1994, Germany told the INS that it would not accept Zadvydas
> because he was not a German citizen. Shortly thereafter, Lithuania
> refused to accept Zadvydas because he was neither a Lithuanian
> citizen nor a permanent resident. In 1996, the INS asked the
> Dominican Republic (Zadvydas' wife's country) to accept him, but
> this effort proved unsuccessful. In 1998, Lithuania rejected, as
> inadequately documented, Zadvydas' effort to obtain Lithuanian
> citizenship based on his parents' citizenship; Zadvydas'
> reapplication is apparently still pending.

25 *Zadvydas*, 533 U.S. at 684.
26        Mr. Ma, the other petitioner in *Zadvydas*, had his removal period expire in 1999,
27 but had been held for some two years more, despite what was believed to be "the
28 'absence' of an 'extant or pending' repatriation agreement" with Cambodia to which he

had been ordered removed. *Id.* at 702.

Here, Petitioner proffers nothing to show that Senegal has refused to accept him (as opposed to simply not having yet done so) or that his ties with Senegal are so disputed that they won't take him, or that removal to Senegal should not be anticipated once his identity is confirmed.

Moreover, the mere passage of some nine months past the end of the removal period does not establish that removal is unlikely. Rather, the likely result is that once Senegal is able to confirm Petitioner's identity, a process which the only evidence shows is ongoing, his prompt removal is to be expected. Certainly, at some point, the mere passage of time might begin to suggest that removal is not to be expected in the foreseeable future. The *Zadvydas* Court opined:

> And for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the "reasonably foreseeable future" conversely would have to shrink. This 6–month presumption, of course, does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future.

*Zadvydas*, 533 U.S. at 701.

The only factor suggesting that Petitioner's removal will be delayed beyond the foreseeable future is the confusion over his identity. But one of two things appears true: either he has now provided his true identity and in due course the papers will be gathered and Senegal will permit the completion of removal in the foreseeable future, or he has not provided his true identity and removal will be delayed indefinitely. But of course, in the latter case, Petitioner's detention would be justified under 8 U.S.C. § 1231(a)(1)(C) and under the current law in the Ninth Circuit, can be continued in perpetuity. And, the former is at odds with the allegations of the Petition and arguments in the Reply.

Based on the foregoing, under the current circumstances, Petitioner has failed to meet his burden of showing that there is good reason to believe that there is no significant likelihood of his removal in the reasonably foreseeable future.

**5. Conclusion**

Based on the foregoing, the undersigned concludes that Petitioner has failed to show that he is entitled to be released from detention based on *Zadvydas*. Accordingly, the Petition should be denied.

## IV.   CERTIFICATE OF APPEALABILITY

**Ruling Not Required** - Rule 11(a), Rules Governing Section 2254 Cases, requires that in habeas cases the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Such certificates are required in cases concerning detention arising "out of process issued by a State court", or in a proceeding under 28 U.S.C. § 2255 attacking a federal criminal judgment or sentence. 28 U.S.C. § 2253(c)(1).

Here, the Petition is brought pursuant to 28 U.S.C. § 2241, and challenges civil detention in immigration proceedings. Accordingly, a decision on a certificate of appealability is not required.

## V.   RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that the Petitioner's Petition for Writ of Habeas Corpus, filed April 18, 2016 (Doc. 1) be **DENIED**.

## VI.   EFFECT OF RECOMMENDATION

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to *Rule 4(a)(1), Federal Rules of Appellate Procedure*, should not be filed until entry of the district court's judgment.

However, pursuant to *Rule 72(b), Federal Rules of Civil Procedure,* the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. *See also* Rule 8(b), Rules

Governing Section 2254 Proceedings. Thereafter, the parties have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any findings or recommendations of the Magistrate Judge will be considered a waiver of a party's right to *de novo* consideration of the issues, *see United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (*en banc*), and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the recommendation of the Magistrate Judge, *Robbins v. Carey*, 481 F.3d 1143, 1146-47 (9th Cir. 2007).

Dated: September 29, 2016

_____
James F. Metcalf
United States Magistrate Judge

16-1116r RR 16 07 14 on HC.docx